United States District Court
Northern District Of Illinois
Eastern Division

LINDA VAN PLEW, )
       Plaintiff, )   No. 05 C 3051
        )
      v. )
        )
JO ANNE BARNHART, )   Magistrate Judge Arlander Keys
COMMISSIONER OF SOCIAL )
SECURITY, )
      Defendant. )

## MEMORANDUM OPINION AND ORDER

Currently before the Court are the parties' Cross-Motions for Summary Judgment. Plaintiff requests that the Court reverse or remand the decision of the Commissioner of the Social Security Administration (the "Commissioner"), finding that Plaintiff was not entitled to Disability Insurance Benefits ("DIB"). Conversely, the Commissioner seeks to have the decision upheld.

### Procedural History

On December 23, 1999, Linda J. Van Plew filed an application for DIB, claiming that she became unable to work on December 11, 1997, after being attacked by a dog. (R. at 84.) That application was denied on March 1, 2000. (R. at 65.) On March 24, 2000, Mrs. Van Plew filed a Request for Reconsideration, which was denied on June 30, 2000. (R. at 69, 71.) On August 11, 2000, she filed a Request for Hearing before an Administrative Law Judge ("ALJ"), and a hearing was held before ALJ John L. Mondi on May 22, 2001.

(R. at 74, 28.) On September 22, 2001, the ALJ rendered an unfavorable decision, and Mrs. Van Plew filed a request to review that decision with the Social Security Administration Appeals Council ("Appeals Council") on November 26, 2001. (R. at 10.) The Appeals Council denied that request on February 1, 2002; as a result, the ALJ's decision represented the final decision of the Commissioner.

Mrs. Van Plew filed a Complaint for Judicial Review in this Court. Pursuant to the parties' stipulation for remand, on September 5, 2003, Magistrate Judge Geraldine Soat Brown entered final judgment in accordance with 42 U.S.C. § 405(g), reversing the Commissioner's decision and remanding the case to the Social Security Administration for further proceedings. (R. at 272.) On November 2, 2004, a supplemental hearing was held before ALJ Mondi. (R. at 277; 328.) The ALJ issued a second unfavorable decision on December 29, 2004, and Plaintiff filed "exceptions" with the Appeals Council on January 20, 2005. (R. at 256, 238). On April 20, 2005, the Appeals Council declined to review the ALJ's decision. Accordingly, that decision stands as the final decision of the Commissioner. (R. at 235.)

## Factual Background

### I. The May 22, 2001 Hearing

### A. Testimony

At the May 22, 2001 hearing, the ALJ heard testimony from Mrs. Van Plew, Mr. Van Plew, and a vocational expert ("VE"), Cheryl Hoiseth.

#### 1. Mrs. Van Plew's Testimony

Mrs. Van Plew stated that she was born on June 16, 1950, and had a high school education. (R. at 33.) Mrs. Van Plew also stated that she is married and has two children, twenty-eight and thirty years old at the time of the hearing. (R. at 33.) She testified that, on December 11, 1997, she was attacked by an Akita dog during the course of her employment at "Critter Sitters," a pet-sitting business. She had been employed there, on a part-time basis, for approximately two years. (R. at 35-36.) Her duties at Critter Sitters consisted of taking care of animals, in their owners' homes, while the owners were away. (R. at 34.)

Mrs. Van Plew testified that, as a result of the dog attack, she suffered nerve damage in her legs and required two surgeries on her left foot. (R. at 36.) After the dog attack, she attempted to return to work for Critter Sitters on a part-time basis, working between four and five hours

per week. (R. at 34.) She testified that the most she earned during that time was between $250 and $300 per month; and that she stopped working for Critter Sitters in August of 1998, because it was too much for her. (R. at 34.) Mrs. Van Plew explained that driving to pet-owners' homes and "trying to remember everything" would confuse her, and that she was frightened of going up and down stairs, because of problems with her balance. (R. at 35.)

Mrs. Van Plew then described her employment history prior to her job at Critter Sitters. She testified that she worked as a receptionist in a chiropractic office, from November 1989 until November 1996, and that she left the job for personal reasons. (R. at 36-37.) That job required her to greet patients, answer the telephone, make appointments, do some insurance work, and make some collection calls. Mrs. Van Plew stated that she stood almost all the time. (R. at 36-37.) She explained that the attack left her unable to perform these tasks, because now she cannot stand or sit for extended periods of time, she cannot comprehend much of what she reads, she suffers from physical "jerks" that would cause frequent errors when typing, and would have difficulty driving. (R. at 37.) Mrs. Van Plew also testified that she worked part-time as a cashier at McDonald's from 1988 to 1999. (R. at 37-38.) She explained

4

that she worked there because her sons did, and quit working there when they did. (R. at 38.)

In response to a question from the ALJ regarding health problems that would prevent her from working, Mrs. Van Plew testified that she suffered from ear pain, head pain, pressure in her eyes, nystagmus,[1] difficulty swallowing, difficulty breathing, weakness in her arms and legs, bladder spasms, burning in her neck, numbness in her back along the spinal cord, and pain in her left foot from the dog attack. (R. at 38.) Mrs. Van Plew also stated that she sometimes suffers anxiety, and had recently experienced depression over the loss of her mother. (R. at 39.) However, Mrs. Van Plew also stated that she did not think her depression was significant. (R. at 39.)

Regarding her medications, Mrs. Van Plew testified that she took Prempro, Prozac, Valium, a large amount of Excedrin, and a medication for her bladder spasms, the name of which she could not recall. (R. at 39.) Mrs. Van Plew stated that she suffered no side effects from these medications. (R. at 39.) When the ALJ asked if she had difficulty sitting, Mrs. Van Plew explained that, depending on the chair, she could sit between five and thirty minutes.

---

[1]An involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotary, or mixed. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 910(26th Edition 1985).

(R. at 40.) Mrs. Van Plew testified that she could walk only a few blocks before her foot would begin to hurt, that she could stand for five to ten minutes, could not lift more than ten pounds, and required assistance to climb two or more flights of stairs. (R. at 40.) She also testified that she could bend over, but avoided doing so because, when she would get back up, she felt as though she would pass out from the pressure in her head. (R. at 40-41.) Mrs. Van Plew testified that she had no problems with her appetite, but that she occasionally had trouble sleeping, explaining that she would sometimes wake up in the middle of the night choking and gasping for air. (R. at 41.)

Mrs. Van Plew explained that she regularly saw several physicians: a neurologist, Dr. Lekah, whom she saw every four to six months; a neurosurgeon, Dr. Frimm, whom she saw once a year; a psychiatrist, Dr. Gallagher, whom she saw five or six times a year; and Dr. Steinberg, whom she saw for her bladder spasms every four months. (R. at 41-42.)

Responding to the ALJ's questions regarding her general living conditions, Mrs. Van Plew testified that she resided in a house in Aurora, Illinois, and that she was able to take care of herself, but could only drive a car sometimes. (R. at 42.) Mrs. Van Plew explained that her eye condition, nystagmus, prevents her from driving ten to fifteen days per

month.  In addition, she stated that this condition prevents her from driving at night.  (R. at 42-43.)  When asked by the ALJ if she ever drives alone, Mrs. Van Plew replied that she would do so only if her vision was okay.  (R. at 44.) Mrs. Van Plew also testified that she was able to do the cooking and cleaning at home, with help, and could even do it without help, although it would take longer to do so. (R. at 43.)  She testified that it takes her several hours to clean the house, whereas before the dog attack it only took one-and-a-half hours.  In addition, Mrs. Van Plew stated that she does the laundry, which involves going downstairs, but that the stairs are not a problem for her, provided that she takes them slowly.  (R. at 43.)  She also explained that her husband carries the laundry downstairs, and she brings just the clothes back up; she never handles any laundry baskets.  (R. at 43-44.)

When asked how she spends her day, Mrs. Van Plew explained that she neither stands nor sits for too long, that she corresponds by computer with a support group to which she belongs, and does "just normal things."  (R. at 44.)  Mrs. Van Plew stated that she had no hobbies or interests, although she used to enjoy country dancing.  (R. at 44.)  She explained that she could no longer dance because of her foot injury.  (R. at 44.)

7

Following the ALJ's questions, Mrs. Van Plew's attorney was provided an opportunity to question her. The attorney asked Mrs. Van Plew if she had ever worked for another chiropractor, after she left Dr. Staker's office. Mrs. Van Plew replied that she had, and explained that her duties at the other chiropractic office were essentially the same as they had been with Dr. Staker. (R. at 46.) Mrs. Van Plew testified that she worked for seven hours per day, three days a week for the chiropractors. (R. at 46.)

Mrs. Van Plew testified that she suffers severe headaches twice per month, and less severe headaches three to four times per month. (R. at 47, 49.) Mrs. Van Plew also testified that she was diagnosed with Chiari malformation five weeks after the dog attack in 1997. (R. at 48.) She opined that her symptoms, related to the Chiari malformation, were triggered either by the trauma relating to the dog attack, the spinal anesthetic that she was given on the day of the attack, or by a combination of the two. (R. at 48.) Mrs. Van Plew testified that she has pain in her mid-back, which, she said, is thought to be from her syringomyelia,[2] a result of her Chiari malformation. (R. at 49.) Mrs. Van Plew described the back-pain as a burning and

[2]Syringomyelia is a condition marked by abnormal cavities filled with liquid in the substance of the spinal cord. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1303(26th Edition 1985)

severe aching, but noted that the medication she takes provides substantial relief.

Mrs. Van Plew stated that she also has difficulty swallowing, all day, every day, and that she does not have a gag reflex. She testified that she has intermittent bladder spasms, which are sometimes painful. Mrs. Van Plew stated that she has a low energy level, which she attributed to all of her symptoms. (R. at 52.) Finally, Mrs. Van Plew testified that she does not function well in stores or other places illuminated by fluorescent lights. (R. at 60.)

### 2. Mr. Van Plew's Testimony

Mr. Van Plew testified that, before the dog attack, his wife had a high energy level, was outgoing, and was a perfectionist. (R. at 54.) However, since the dog attack, Mrs. Van Plew often seems to know what she wants to say, but has difficulty expressing herself. (R. at 54-55.)

### 3. VE Cheryl Hoiseth's Testimony

In response to questions from the ALJ, VE Hoiseth described the skill levels and exertional demands of Mrs. Van Plew's previous work. (R. at 56.) With respect to Mrs. Van Plew's work at Critter Sitters and McDonald's, the VE stated that those jobs are classified as light, unskilled work; while her receptionist work is classified as light and semiskilled. (R. at 56-57.) The ALJ next posed several

9

hypotheticals to the VE to assess Mrs. Van Plew's employability. Initially, the ALJ asked the VE to consider jobs that would be available to someone who: (1) is 50, soon to be 51 years old; (2) has a high school education; (3) has work experience as listed above; and (4) has the residual functional capacity ("RFC") that the Department of Disability Services ("DDS") found for Mrs. Van Plew.[3] (R. at 57.) The VE testified that such a person could perform Mrs. Van Plew's previous job as a receptionist. (R. at 57.)

The ALJ then modified this hypothetical to include the limitation that the person was limited to sedentary work. The VE testified that, in that case, the hypothetical person could not return to the receptionist position as described by Mrs. Van Plew. The VE noted, however, that the position of receptionist, as defined in the <u>Dictionary of Occupational Titles</u>, was listed at the sedentary level. Accordingly, the VE concluded that the hypothetical person could still return to receptionist work. (R. at 58.)

The ALJ next asked VE Hoiseth what the hypothetical person's vocational outlook would be if she accepted Mrs. Van Plew's testimony as an accurate depiction of the

---

[3]The DDS found that she could perform light work not involving climbing of ladders, ropes, and scaffolds, or more than occasional balancing, stooping, kneeling, crouching, crawling or climbing of ramps and stairs, subject to a need to avoid even moderate exposure to hazards, machines, and heights.

hypothetical person's capabilities and limitations. (R. at 58.) The VE testified that such limitations would preclude work, even at the sedentary level. (R. at 58.) Finally, the ALJ asked what the effect would be if the hypothetical person could not function where there was fluorescent lighting. The VE explained that, because fluorescent lighting is commonplace, such a limitation would preclude any kind of office work. (R. at 61.)

## B. Medical History

### 1. Emergency Room

Mrs. Van Plew was admitted to the emergency room at Mercy Center for Health Care Services on December 11, 1997, and was discharged the following day. (R. at 158.) She was admitted for injuries resulting from the dog attack, including lacerations and abrasions to her legs and left foot. (R. at 158.) An x-ray of Mrs. Van Plew's left foot showed comminuted compound open fractures of the third and fourth metatarsal. (R. at 162.) She underwent surgery the day that she was admitted to the emergency room, which revealed that the second metatarsal of her left foot was severely fractured. (R. at 164.) After Mrs. Van Plew was anesthetized with a spinal anesthetic, a manual open reduction without internal fixation was done to improve the position of the fractures. (R. at 164.) The surgeon, Dr.

Lacart, noted that she tolerated the procedure well, and went to the recovery room in excellent condition. (R. at 164.)

### 2. Dr. Wallace - Radiologist

On January 22, 1998, an MRI was performed on Mrs. Van Plew's brain. (R. at 167.) A radiologist, Dr. D. B. Wallace, found a marked extension of the cerebellar tonsils inferior to the foramen magnum compatible with Chiari 1 malformation. (R. at 167.) Dr. Wallace observed that the inferior tip of the cerebellar tonsils was approximately 2.5 centimeters inferior to the foramen magnum, and noted that anything over 12 millimeters is almost always symptomatic. (R. at 167.) Dr. Wallace saw no evidence of hydrocephalus, mass effect, or shift. (R. at 167.) However, he found a small syringohydromyelia in the upper cervical cord, at about the C2 level. (R. at 167.)

### 3. Dr. Frimm - Neurosurgeon

On July 15, 1999, because Mrs. Van Plew was asymptomatic, Dr. David M. Frim recommended that she either undergo prophylactic surgical decompression for the syrinx, or wait until her condition worsened to undergo surgery. (R. at 174.) On August 12, 1999, Dr. Frim reviewed the results of a subsequent MRI scan. (R. at 173.) He opined that, if anything, Mrs. Van Plew's cervical syrinx was

12

smaller than it had been in her previous MRI. (R. at 173.)
Dr. Frimm noted that she had no evidence of tethered spinal
cord, nor classic Chiari symptoms of headache or upper
extremity symptoms, but did have evidence of bladder
dysfunction. (R. at 173.) He concluded that the best
course of action for Mrs. Van Plew, provided that her
symptoms did not worsen, was simply to return for a check-up
one year later. (R. at 173.)

### 4. Dr. Gupta - DDS Physician

On January 28, 2000, Mrs. Van Plew was examined for the
DDS by Dr. Seema Gupta. (R. 177.) Dr. Gupta noted that
Mrs. Van Plew suffered from severe ataxia, nystagmus,
anxiety, and obsessive compulsive disorder. (R. at 179.)
Dr. Gupta also noted that Mrs. Van Plew had a normal gait,
but was unable to tandem walk or hop on one leg. *Id.*

### 5. Dr. Nemeth - Psychiatrist

On February 7, 2000, Dr. Joseph M. Nemeth performed a
psychiatric evaluation of Mrs. Van Plew for the DDS. (R. at
180.) Dr. Nemeth concluded that she suffered from an
obsessive compulsive disorder and adjustment disorder of
adult life, not otherwise specified. (R. at 181.)

### 6. Dr. Griffin - DDS Physician

On February 23, 2000, Dr. John Griffin performed an RFC
assessment of Mrs. Van Plew for the DDS. (R. at 191.) Dr.

13

Griffin found that Mrs. Van Plew could occasionally lift
twenty pounds, and frequently lift ten pounds.  (R. at 192.)
In addition, he found that Mrs. Van Plew could stand or
walk, with normal breaks, for about six hours in an eight-
hour workday; and she could also sit, with normal breaks,
for about six hours in an eight-hour workday.  (R. at 192.)
Regarding postural limitations, Dr. Griffin found that Mrs.
Van Plew's RFC included a limitation against climbing
ladders, ropes and scaffolds; more than occasional
balancing, stooping, kneeling, crouching, crawling, or
climbing of ramps and stairs; or exposure to even moderate
hazards, machines, and heights.  (R. at 193, 195.)  Dr.
Griffin concluded that, due to fatigue associated with Mrs.
Van Plew's condition, she was limited to light work activity
and should avoid jobs requiring exposure to unprotected
heights due to dizziness.  (R. at 198.)

### 7. Dr. Gallagher - Psychiatrist

On May 5, 2000, Dr. J. Richard Gallagher stated that
Mrs. Van Plew had no significant psychiatric disability, and
that her mental status and psychological state did not
interfere with her ability to do work-related activities,
such as understand, carry out and remember instructions,
respond appropriately to supervision, co-workers, and
customary work pressures.  (R. at 201.)  Dr. Gallagher had

14

seen Mrs. Van Plew, episodically, since 1975, and had last evaluated her on March 13, 2000. (R. at 200.) Dr. Gallagher stated that he was seeing Mrs. Van Plew, at that time, about every two to four months. (R. at 200.)

### 8. Dr. Lekah - Neurologist

On December 14, 1998, Dr. Lekah conducted a neurologic exam of Mrs. Van Plew and found that she had some difficulty with gait and coordination problems in her left hand, but that she did not have motor or sensory difficulty. (R. 206.) On exam, Dr. Lekah observed that Mrs. Van Plew suffered from rotary nystagmus, which he concluded was most likely due to brain stem compression from the Chiari malformation. (R. at 206.) Dr. Lekah stated that Mrs. Van Plew's neurologic exam was relatively intact, explaining that, while she had some difficulty with brain stem findings and coordination, the rest of it was "not that bad." (R. at 206.) Therefore, Dr. Lekah concluded that surgery was not advisable, at that time, and that her pain should be managed pharmacologically. (R. at 206.)

On March 11, 1999, Dr. Lekah saw Mrs. Van Plew for a follow-up visit and, again, decided against recommending surgery. (R. at 205.) On July 20, 1999, Dr. Lekah opined that she had extension of her syringomyelia down to the thoracic spine, noting that the condition may be related to

15

her swallowing difficulty, absent gag reflex, and shortness
of breath. (R. at 204.) Dr. Lekah noted that Mrs. Van Plew
had no motor deficits, or any significant gait difficulty,
and that her headaches were under better control. (R. at
204.) He concluded that mostly symptomatic adjustments
needed to be made, and that Mrs. Van Plew could wait for
surgery. (R. at 204.) Dr. Lekah also saw Mrs. Van Plew on
October 18, 1999, and concluded that she had been doing well
and was stable. (R. at 203.) He noted, however, that her
syringomyelia most likely extended to the thoracic spine,
causing her pain on the left side of her upper back. (R. at
203.) On January 24, 2000, after another follow up visit,
Dr. Lekah concluded that Mrs. Van Plew was doing well, and
that no changes in her regimen were needed. (R. at 202.)

### 9. Dr. Appleton, PhD - Psychologist

On June 9, 2000, Mrs. Van Plew was evaluated for the
DDS by Dr. Helen Appleton, who completed a Psychiatric
Review Technique Form. (R. 211.) Dr. Appleton found that
Mrs. Van Plew had impairments, which were not severe, based
on anxiety related disorders, i.e. Listing 12.06. (R. at
211.) However, Dr. Appleton concluded that none of Mrs. Van
Plew's functional limitations manifested at the degree of
limitation that satisfies the Listings. (R. at 217.)

16

### 10. Dr. Frenkel – Opthamologist

On July 5, 2001, in response to a medical questionnaire prepared by Mrs. Van Plew's attorney, Dr. Marcel Frenkel stated that it would be reasonable to expect that Mrs. Van Plew would be sensitive to office lighting. (R. at 231.) Dr. Frenkel stated that Mrs. Van Plew had difficulty in focusing, and also with balance while walking. *Id.* Dr. Frenkel concluded that these difficulties were most likely related to Mrs. Van Plew's Chiari malformation. *Id.*

### III. ALJ Mondi's September 22, 2001 Decision

The ALJ found that Mrs. Van Plew met the nondisability requirements set forth in Section 216(I) of the Social Security Act and was insured for disability benefits through September 22, 2001. (R. at 17.) The ALJ also found that Mrs. Van Plew had medically determinable impairments which were severe, including obsessive compulsive disorder, depression, Arnold Chiari malformation, and syringomyelia. However, the ALJ concluded that none of those impairments met or equaled any impairment listed in Appendix 1, Subpart P, Regulations No. 4. (R. at 259.)

In determining Mrs. Van Plew's RFC, the ALJ observed that Mrs. Van Plew's treating neurologist, Dr. Lekah, reported on December 14, 1998, that she had a history of Arnold Chiari malformation, and that, when last seen on

17

January 24, 2000, she was "doing well" with a normal examination except for rotary nystagmus and an absent gag reflex. (R. at 18.) The ALJ also noted that Mrs. Van Plew's treating psychiatrist, Dr. Gallagher, reported on May 9, 2000, that she engaged in a wide range of activities and she did not experience a significant limitation in her ability to engage in work-related activities, such as understanding, carrying out and remembering instructions, and responding appropriately to supervision, co-workers, and customary work pressures. (R. at 18.)

The ALJ observed that state agency medical and psychological consultants concluded that Mrs. Van Plew had the RFC for light work not involving climbing of ladders, ropes, and scaffolds, or more than occasional balancing, stooping, kneeling, crouching, crawling or climbing of ramps and stairs, subject to a need to avoid even moderate exposure to hazards, machines, and heights. (R. at 18.) The ALJ explained that the record warranted according controlling weight to the findings of the state agency consultants regarding the nature and severity of Mrs. Van Plew's impairments, because they were consistent with the overall records, including the opinions of her treating physicians. The ALJ considered the report of opthamologist Frenkel, which was forwarded to him after the hearing,

stating that Mrs. Van Plew would have difficulty working with small sharp objects and reading small print, and that it would be reasonable to conclude that she would be sensitive to office lighting. (R. at 18.) However, the ALJ explained that Dr. Frenkel's report did not warrant a reduction in Mrs. Van Plew's RFC, because he saw her only once. Moreover, the ALJ noted that Mrs. Van Plew's testimony was inconsistent with regard to her ability to read; specifically, that she testified to difficulty in reading, yet also stated that she uses a personal computer and indicated no difficulty in doing so. (R. at 18.)

The ALJ also concluded that Mrs. Van Plew's testimony regarding her pain and functional limitations was not credible when compared against the objective evidence. The ALJ noted that, despite her allegedly disabling impairments, Mrs. Van Plew was seen by physicians only periodically and, when seen, her various conditions appeared stable and her symptoms were adequately controlled on medication. (R. at 19.) In addition, the ALJ observed that her treating psychiatrist reported that she could engage in a wide range of activities, and had no limitation on her ability to engage in work-related activities, which suggested to the ALJ that Mrs. Van Plew's impairments may not have even been severe. The ALJ found that Mrs. Van Plew's testimony was

noteworthy for portraying greater limitations than were
reflected in the reports from her treating neurologist and
psychiatrist.

The ALJ concluded that, given the testimony of the VE,
the record was persuasive that Mrs. Van Plew could not do
her past receptionist work as previously performed, but that
she could do that job at the sedentary level, as it is
generally performed in the economy. Therefore, the ALJ
decided that Mrs. Van Plew could return to past relevant
work and was not under a disability as defined in the Social
Security Act. (R. at 19, 20.)

**IV. The November 2, 2004 Hearing**

At the November 2, 2004 hearing, the ALJ heard
testimony from Mrs. Van Plew and a medical expert ("ME"),
Dr. Walter Miller.

**A. Testimony**

**1. Mrs. Van Plew's Testimony**

Mrs. Van Plew stated that she had neither worked nor
looked for work since the first hearing. She testified that
her difficulty in comprehending written material had
worsened since that time, and that she constantly needed to
re-read sentences. (R. at 349, 355.) Mrs. Van Plew
attributed this problem to her nystagmus, and explained
that, by the time she finishes reading two sentences, she

has forgotten the first sentence. (R. at 349.) Mrs. Van Plew stated that, as a result of these difficulties, she does not read books or magazines, and attempts to read the newspaper only if there is an article of particular interest to her. (R. at 350-51.) She explained that she requires approximately ten minutes to read an article, and needs to take breaks when reading, because it makes her tired. (R. at 351.)

In addition, Mrs. Van Plew testified that her vision had deteriorated since the first hearing, as had her balance, ability to swallow, and arm-strength. (R. at 335.) She also stated that the pressure in her head had worsened, and that she suffered headaches almost every morning. *Id.* Mrs. Van Plew testified that she was experiencing more burning pain, and that she can barely lift half a gallon of milk. *Id.* She stated that she can walk only one block, stand for five to ten minutes, and sit for fifteen to twenty minutes, but has significant pain when she does so. Mrs. Van Plew testified that she was taking Prempro, Prozac, Ultram, and Excedrin every day, and sometimes Valium to help her sleep at night. She explained that she keeps Darvocet on hand, in case the other medications fail to provide relief, and that she does not experience any side-effects from her medications. (R. at 336.)

With regard to her physicians, Mrs. Van Plew testified that she saw her treating neurologist, Dr. Steven Lekah, every four to six months. (R. at 337.) She also testified that she was still seeing Dr. Gallagher, her psychiatrist, every few months, as well as a neurosurgeon, Dr. Frimm, and Dr. Chu, an opthamologist. (R. at 339.)

In comparing her daily activities at the time of the second hearing to those at the time of the previous hearing, Mrs. Van Plew testified that she rarely cooks; she still maintains the house, although at a much slower pace; and she drives, only within a three-mile radius. (R. at 339.) She testified that her husband takes her grocery shopping, and that she almost never goes to the store by herself. (R. at 340, 345.) Mrs. Van Plew explained that she can still do the laundry, if her husband takes it downstairs. She also stated that she can carry the lighter clothes back upstairs. (R. at 342-43.) Mrs. Van Plew specifically stated that she does not carry heavier clothes, such as her husband's work clothes and jeans, upstairs. (R. at 343.) She also testified that her balance problems worsen if she walks too much. Mrs. Van Plew explained that she did not know why she loses her balance, but noted that, when walking outdoors, she tends to sway to the left, and that she frequently runs into walls indoors. (R. at 345.)     Mrs. Van Plew

testified that she is sensitive to light, and that the
fluorescent lighting in the hearing room was causing her a
headache.  (R. at 352.)  Mrs. Van Plew also testified that
she suffers from back pain, which requires her to lie on the
floor approximately two to three times per day.  (R. at
356.)  She explained that she did not have back pain until
she was diagnosed with Chiari malformation in January 1998.
(R. at 357.)  In addition, Mrs. Van Plew testified that she
suffers from chronic fatigue.  She stated that simply
getting herself ready to attend the hearing that day
exhausted her.  (R. at 360.)  Mrs. Van Plew testified that
the most physically exerting activity she ever undertakes is
occasional weed-pulling in the yard.  (R. at 360.)

### 2. The Medical Expert's Testimony

ME Dr. Walter Miller testified that Listing 11.19(a)
describes significant bulbar signs, which include pain going
down the arms, impairment of bladder and bowel functions,
weakness of the hands, loss of muscle strength, and atrophy
of the hands.  (R. at 373.)  The ME observed that Mrs. Van
Plew's 1999 medical records state that "she continues not to
have classical Chiari symptoms, but she does have some
evidence of bladder dysfunction."  (R. at 374.)  He
explained that the bladder dysfunction associated with
Chiari malformation is a loss of function, which is the

opposite of the bladder spasms from which Mrs. Van Plew suffers. (R. at 374.) The ME testified that a surgical drainage procedure can be performed to relieve Chiari symptoms, and stated that he was puzzled as to why Mrs. Van Plew would not consider surgery, given that she claimed her symptoms were disabling. (R. at 374-75.)

The ME also noted a lack of up-to-date records, such as records of the radiological descriptions of her MRIs. (R. at 375.) Accordingly, the ME stated that both the extent of Mrs. Van Plew's herniation and the portion of her condition that was intracranial were unknown. (R. at 375.) The ME testified that Mrs. Van Plew had local symptoms in her upper spinal cord that were causing localized pain in her mid-back. (R. at 375.) He opined that Mrs. Van Plew's main condition is pain in that area. (R. at 375.) The ME then stated that he was at a loss to explain what the total effect of this is on her vision. (R. at 375.) He noted that some detailed neurological examinations from 1999 were in the record, but that to give an up-to-date evaluation in 2004, he would need something else to support Mrs. Van Plew's symptoms. (R. at 376.) The ME reiterated his puzzlement regarding her vision problems, and also noted that her balance is affected. However, without a symptom evaluation by her neurologist, the ME explained that there

was no way to evaluate that problem. *Id.* Accordingly, the ME opined that there was no correlation, without which he could not say that Mrs. Van Plew met a listing. *Id.*

When asked by the ALJ if Mrs. Van Plew's impairments met or equaled any other Listing, the ME replied that they did not, because her conditions were "mild." (R. at 377.) The ALJ then asked if there could be any evidence, that would be forthcoming, which could change the ME's opinion on whether a Listing was met. (R. at 378.) The ME stated that it was possible, but unlikely, because he doubted that the new evidence would show that there were significant bulbar signs under syringomyelia. *Id.*

The ALJ then provided Mrs. Van Plew's attorney an opportunity to question the ME. (R. 379.) After some confusion regarding whether Mrs. Van Plew had submitted additional medical records prior to the hearing, the ALJ admitted copies of additional medical records, entered as Exhibits 26, 27, and 28. (R. at 381.) Having provided the ME an opportunity to examine these exhibits, the ALJ again asked him for his opinion as to whether the record showed an impairment that met or equaled any Listing. (R. at 382.) The ME stated that his testimony remained unchanged. (R. at 382.) The ME explained that the reports showed that Mrs. Van Plew's condition was unchanged, or slightly improved,

25

but definitely not worse. He also observed that Mrs. Van Plew failed to submit any records documenting her physicians' opinions of her condition since 2000. (R. at 382.) However, the ME concluded that her condition probably had not changed since that time, because the reports that were submitted noted that her condition was stable. (R. at 383.)

When asked whether Mrs. Van Plew met any other Listing besides 11.19, such as 11.04, the ME stated that her testimony did not describe the "significant and persistent disorganization of motor function of two extremities resulting in sustained disturbance of gross and dexterous movements or gate or station" required by that listing. (R. at 383.) Moreover, regarding Mrs. Van Plew's gait, the ME testified that he did not think the loss of balance she described was sufficient to meet a Listing. (R. 384.)

When asked by Mrs. Van Plew's attorney whether there was evidence of pathology described in Mrs. Van Plew's medical records, the ME stated that there was such evidence, and that the symptoms that Mrs. Van Plew described were consistent with it. (R. at 386-87.) However, the ME testified that Mrs. Van Plew's doctors did not explain what effect that pathology has on her. (R. at 387.) When asked if Chiari malformation ever improves, the ME replied that,

in Mrs. Van Plew's case, it appeared to have done so. (R. at 387.)

When asked if there were any medical records that would support Mrs. Van Plew's testimony that she loses her balance, the ME replied that there were. (R. at 396.) When asked if there were such records to support her claims of neuropathic back pain, stress, and fatigue, the ME again replied affirmatively. (R. at 396-97.) The ME also testified that there was record evidence concerning Mrs. Van Plew's bladder problem, but that the spastic bladder problem noted in the record was the opposite of the kind of problem that would be associated with a cord injury. (R. at 397.) Finally, when asked if there was any record evidence that supported Mrs. Van Plew's claim that bright lights bother her, and cause her fatigue and headaches, the ME replied that the only evidence in the record that supported the claim was her own testimony. (R. at 398.) He testified that Mrs. Van Plew's nystagmus had nothing to do with her being bothered by bright lights. (R. at 398.)

## B. Medical History

At the second hearing, ALJ Mondi was presented with additional medical records, provided by various physicians. The Court will briefly review this additional medical

history to present an adequate picture of Mrs. Van Plew's condition.

### 1. Dr. Chu - Opthamologist

The record contains a medical report from Dr. John Chu, Mrs. Van Plew's opthamologist, dated November 1, 2004, in which he stated that Mrs. Van Plew suffered from nystagmus, which caused her oscillopsia.[4] (R. at 291.) Dr. Chu explained that, as a result of this condition, Mrs. Van Plew's eyes lose focus, causing her to tire easily as she tries to constantly re-focus. (R. at 291.) In a medical source statement, Dr. Chu. stated that the prognosis for Mrs. Van Plew's nystagmus was stable, but that it would limit her ability to maintain concentration during two-hour segments of an eight-hour day. (R. at 309.)

### 2. Dr. Gallagher - Psychiatrist

Subsequent to the hearing, the ALJ was provided with a copy of a mental impairment medical source statement from Dr. Gallagher, dated October 25, 2004. (R. at 302.) In assessing Mrs. Van Plew, Dr. Gallagher considered sixteen criteria for mental abilities and aptitude needed to perform unskilled work, and checked off "good" next to each one. (R. at 303.) He also considered four factors in determining

---

[4]Oscillopsia is a condition in which objects appear to oscillate. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 939(26th Edition 1985)

whether Mrs. Van Plew had the aptitude to perform semi-skilled and skilled work, and, again, checked off "good" next to each criterion. (R. at 303.) Dr. Gallagher noted that she had no restriction of daily living activities, no difficulties in maintaining social functioning, and seldom had deficiencies of concentration. (R. at 304.)

### 3. Dr. Lekah - Neurologist

Dr. Lekah also provided a medical source statement, dated December 18, 2004. (R. at 243.) Dr. Lekah stated that Mrs. Van Plew could sit, continuously, for one hour and forty-five minutes. (R. at 244.) However, Dr. Lekah also stated that she needed to walk around almost every fifteen minutes during an eight-hour work day. (R. at 245.) Dr. Lekah noted that Mrs. Van Plew required a job that would allow her to shift positions at will from sitting, standing, or walking; and needed to be able to take two or three unscheduled breaks during the workday. (R. at 245.) Dr. Lekah stated that Mrs. Van Plew suffered, almost daily, from headaches which caused her vertigo, nausea, and malaise. (R. at 248.) He also noted that bright lights worsen her headaches, (R. at 249) but that they are controlled by medication and, therefore, would not prevent her from performing basic work activities. (R. at 251.) However, Dr. Lekah opined that Mrs. Van Plew's headaches would cause

her to be absent from work about twice a month.  (R. at
251.)

**4. Dr. Dolin - Radiologist**

An August 23, 2004 MRI report, by Dr. Edwin H. Dolin,
regarding Mrs. Van Plew's brain and lumbar spine, revealed
that her Chiari malformation remained the same, or was
slightly improved, when compared to August 30, 2002.  (R. at
298.)

**V. The ALJ's December 29, 2004 Decision**

The ALJ found that Mrs. Van Plew met the nondisability
requirements for a period of disability and DIB on December
11, 1997, the date of the dog attack, and continued to be
insured for benefits through March 30, 2003, but not
thereafter.  (R. at 259.)  The ALJ found that the record was
consistent with the ME's assessment that, while Mrs. Van
Plew's impairments were severe, she did not have an
impairment that met or equaled any impairment listed in
Appendix 1, Subpart P, Regulation No. 4, including Listing
11.19(A).  (R. at 258, 260.)  The ALJ determined that Mrs.
Van Plew's impairments allow her to perform light work not
involving climbing ladders, ropes, and scaffolds; more than
occasional balancing, stooping, kneeling, crouching,
crawling, or climbing of ramps and stairs; or exposure to
even moderate hazards, machines, and heights.  (R. at 258.)

Moreover, the ALJ concluded that the record did not support Mrs. Van Plew's claim of worsening symptoms. The ALJ found that Mrs. Van Plew's testimony, including that of pain and functional limitations, was incredible in light of objective evidence, especially when evaluated using the factors described in SSR 96-7p. (R. at 258.) Thus, the ALJ concluded that Mrs. Van Plew's testimony "was not credible in establishing limitations that would preclude a significant range of light work, consistent with probative testimony from a vocational expert at the first hearing." *Id.* While noting that Mrs. Van Plew had been periodically examined by physicians, the ALJ stated that her conditions appeared stable and adequately controlled on medication. *Id.* For support, the ALJ pointed to Dr. Lekah's January 24, 2000 report that Mrs. Van Plew was "doing well," and Dr. Gallagher's May 9, 2000 report that she had no significant limitation in her ability to engage in work-related activities. *Id.*

The ALJ also observed that, although Mrs. Van Plew complained of balance problems, she did not have a cane at the supplementary hearing, and that she admitted carrying laundry upstairs. Moreover, the ALJ noted that, although Mrs. Van Plew testified to problems with lights, she did not wear dark glasses to the supplementary hearing. (R. at

31

259.) The ALJ also adopted the findings made by state agency medical and psychological consultants regarding the nature and severity of Mrs. Van Plew's impairments, because they were consistent with the overall medical records. (R. at 259.) The DDS reports show that, despite some restrictions on Mrs. Van Plew's RFC, she is capable of engaging in light work activity. The ALJ discounted Dr. Frenkel's report, in which he stated that Mrs. Van Plew would have difficulty reading small print, and working with small or sharp objects. The ALJ discredited this report because Mrs. Van Plew saw Dr. Frenkel only once, and because his opinion lacked support in her complaints to other physicians. *Id.*

In addition, the ALJ observed that, while Mrs. Van Plew reported difficulty in reading, she also testified that she used a computer and gave no indication of difficulty in doing that. *Id.* The ALJ found that Mrs. Van Plew's testimony that she carried light laundry up stairs indicated that her balance problem does not preclude all walking and climbing. *Id.* Accordingly, the ALJ concluded that Mrs. Van Plew could perform her past work as a receptionist; therefore, she was not disabled. Accordingly, the ALJ denied her claim for benefits under Sections 216(I) and 223 of the Social Security Act. (R. 260.)

32

## Standard of Review

A reviewing district court must affirm an ALJ's decision if it is supported by substantial evidence and is free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Where, however, "the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. In *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir. 1992), the Seventh Circuit explained that "the level of articulation is far from precise." But, "it is enough if the ALJ indicates the path of the decision. The administrative tribunal need not spell out every step in the reasoning, if it provides enough of the steps that the full course may be discerned." *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988). Thus, in the Seventh Circuit, an ALJ must "build an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, the Court must remand. *Steele*, 290 F.3d at 941.

## Social Security Regulations

Disability Insurance Benefits are available only to claimants who can establish "disability" under the terms of the Social Security Act. The Social Security Regulations provide a five-step sequential analysis for determining disability for purposes of eligibility for benefits. Under the Regulations, the ALJ is required to evaluate, in sequence: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. § 404.1520 (2003). A negative answer at any step other than Step Three precludes a finding of disability. *Id.* at 389. The Plaintiff has the burden of proof at Steps One to Four. *Balenton v. Halter*, 156 F. Supp. 2d 776, 782 (N.D. Ill. 2001). If the claimant's burden is met, the burden shifts to the Commissioner at Step Five to show that the claimant has the ability to engage in other work existing in significant numbers in the national economy. *Id.; Young*, 957 F.2d at 389.

## Discussion

Applying the five-step analysis outlined above, ALJ Mondi first determined that Mrs. Van Plew had not engaged in substantial gainful activity since her alleged onset date. (R. at 259.) At Step Two, the ALJ determined that Mrs. Van Plew had medically determinable impairments that, at least in combination, were "severe," based on the requirements in Regulations 20 CFR § 404.1520©). (R. at 260.) But, at Step Three, the ALJ found that her impairments did not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (R. at 260.) Finally, at Step Four, the ALJ determined that Mrs. Van Plew has the RFC to perform her past work as a receptionist. (R. at 260.) The ALJ did not address Step Five; he made no findings concerning Mrs. Van Plew's ability to perform other work that exists in the national economy.

Mrs. Van Plew argues that the ALJ's decision must be reversed or remanded for four reasons: (1) the ALJ's credibility findings are inadequate under Social Security Ruling (SSR) 96-7p; (2) the ALJ's Step Four finding is flawed, because he explicitly adopted the opinion of state agency physicians, without minimally articulating his reasons for doing so; (3) the ALJ deprived Mrs. Van Plew of her right to due process, by failing to provide her with an

opportunity to cross-examine the VE on the evidence submitted after the first hearing; and (4) the ALJ failed to undertake his own analysis of Mrs. Van Plew's impairments at Step Three or, in the alternative, to minimally articulate why he adopted the ME's conclusions. The Court will address each argument in turn.

## A. The ALJ's Credibility Determination Was Not Patently Wrong

Mrs. Van Plew first argues that the ALJ's evaluation of her credibility regarding her symptoms was conclusory and insufficient under SSR 96-7p. In particular, Mrs. Van Plew notes that the ALJ did not explain why Dr. Lekah's diagnosis of Chiari malformation, headaches, and pain on the right side of her head does not constitute objective evidence supporting her claims. Mrs. Van Plew contends that, in discounting her subjective complaints of pain, the ALJ instead focused on a one-page report from Dr. Lekah, in which he stated that she was "doing well." Mrs. Van Plew argues that this report, alone, is an insufficient basis for the ALJ's credibility determination. In addition, Mrs. Van Plew contends that the ALJ did not refer to other objective evidence supporting her claim, such as Dr. Chu's opthamology reports, and failed to explain why he accorded less weight to Dr. Frenkel's opinion than to the DDS physicians.

The ALJ found that Mrs. Van Plew's testimony was not credible in establishing limitations that would preclude a significant range of light work, when compared against objective evidence and evaluated using factors in SSR 96-7p. Had the ALJ rested his determination of Mrs. Van Plew's credibility only on this statement, the Court would remand for clarification of the ALJ's reasoning. *See generally Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (the ALJ must articulate, at some minimal level, the analysis of the evidence to permit accurate review.) However, here, the ALJ did sufficiently explain his credibility determination.

SSR 96-7p provides that, when a claimant's complaints of disabling symptoms and limitations are not substantiated by objective medical evidence, the ALJ must make a credibility finding based on a consideration of the entire case record. Pursuant to 20 C.F.R. § 404.1529(c)(3)(West 2001), the following factors may be considered in assessing Mrs. Van Plew's credibility: her statements about her symptoms; her daily activities; evidence submitted by the treating and/or examining physicians; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken; treatment received other than medication; any other

pain relief measures used; and other factors concerning her limitations and restrictions.

Seventh Circuit caselaw makes clear that an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion" *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). However, the ALJ is not required to discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Rather, an ALJ must consider the evidence in its entirety. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000); see also, *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (an ALJ's opinion must demonstrate that he has reviewed all of the evidence to permit appellate review, but the ALJ is not required to discuss each item of evidence.) Significantly, an ALJ's credibility determination will not be disturbed so long as it finds some support in the record and is not "patently wrong." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (citing *Wolfe v. Shalala*, 997 F.2d 321, 326 (7th Cir. 1993)).

Here, the ALJ considered the record as a whole, which includes factors such as Mrs. Van Plew's daily activities, her subjective complaints of disabling symptoms and limitations, the treating and examining physicians' exam

38

results, the effectiveness and side effects of her
medications, and her routine and conservative treatment.[5]

The ALJ concluded that Mrs. Van Plew's testimony was
not credible in establishing limitations that would preclude
light work because, "while claimant has been periodically
seen by physicians, her various conditions appear stable and
adequately controlled on medication." To support that
conclusion, the ALJ specifically points to Dr. Lekah's
January 2000 report, which stated that she was doing well
and did not require any changes to her regimen; as well as
the report of her long-time psychiatrist, Dr. Gallagher, in
which he stated that Mrs. Van Plew participated in a wide
range of activities, and experienced no significant
limitation in her ability to engage in work-related
activities. Indeed, although Mrs. Van Plew claimed that she
was unable to continue working for Critter Sitters because
"trying to remember everything" would confuse her, (R. at
35) Dr. Gallagher's May 5, 2000 report stated that she could
remember and carry out instructions.

The ALJ also noted that the state agency physicians'
findings regarding the nature and severity of Mrs. Van

---

[5]The Court refers to Mrs. Van Plew's treatment as
conservative, because she opted not to undergo surgery to
relieve her symptoms. This is not to suggest, however, that
she should have opted for any other treatment.

Plew's impairments, were credible because they were consistent with the overall record. The ALJ is entitled to rely on the reports of those physicians. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Waite v. Bowen*, 819 F.2d 1356, 1360 (7th Cir. 1987) (explaining that it was appropriate for an ALJ to rely on the opinions of state agency physicians in determining medical equivalence, because those physicians were appointed by the Secretary). Moreover, the ALJ considered a report from Dr. Frenkel, which was favorable to Mrs. Van Plew's claim, but explained that Dr. Frenkel's opinion was not entitled to much weight, because he saw Mrs. Van Plew only once, and because his opinion was inconsistent with her complaints to other physicians. Accordingly, the Court concludes that the ALJ considered the evidence in its entirety, and did not selectively discuss only that evidence which supported his conclusion.

Mrs. Van Plew also argues that it was error for the ALJ to discredit her testimony regarding balance problems and sensitivity to light, on the grounds that she did not use a cane or wear dark glasses at her hearings, and could carry light laundry up stairs. Mrs. Van Plew contends that there is no substantial evidence that she requires a cane to walk, particularly when accompanied by her husband, or that

sensitivity to lighting required her to anticipate the lighting in the hearing room. Moreover, regarding carrying laundry up stairs, she contends that the ALJ did not consider the intermittent characteristic of the symptoms from which she suffers.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Oftentimes, a credibility determination involves inarticulable elements that "leave no trace that can be discerned in this or any other transcript." *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992) (quoting *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986)). Mrs. Van Plew seems to argue that the ALJ is not entitled to use common sense concerning his observations that she did not use a cane or wear dark glasses. However, the Seventh Circuit has explained that "an ALJ does not commit an impropriety when he relies on his own observations during a hearing concerning the severity of a claimant's claim. Such observations are credibility determinations and are entitled to considerable weight." *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989) (quoting *Whitney v. Schweiker*, 695 F.2d 784 (7th Cir. 1982)). Accordingly, the

41

Court does not find the ALJ's reliance on his own observation of Mrs. Van Plew to be unreasonable. Moreover, the ALJ did not rest his credibility determination on Mrs. Van Plew's admission that she carried light laundry up stairs. Instead, he simply noted that her ability to do so indicates, consistent with her RFC, that she is not precluded from all walking and climbing. Therefore, the Court concludes that the ALJ fulfilled his obligations and rejects Plaintiff's claim of error.

## B. The ALJ's Step Four Determination Was Not Patently Wrong

Mrs. Van Plew next argues that it is legal error for the ALJ, at Step Four, to "adopt" the conclusions of the DDS physicians without minimally articulating his reasons for doing so. The Court is not persuaded by this argument, because the ALJ expressly stated that the findings of the state agency medical and psychological consultants were consistent with the overall records. As noted above, the ALJ may properly rely upon the opinions of these medical experts. *Scheck v. Barnhart*, 357 F.3d at 700. Indeed, the ALJ observed that the state agency findings were consistent with those of Mrs. Van Plew's own treating physician and psychiatrist. For example, while DDS psychologist Dr. Appleton found that Mrs. Van Plew had impairments based on anxiety related disorders, Dr. Appleton concluded that those

impairments were not severe enough to meet a listing. Dr. Gallagher, Mrs. Van Plew's treating psychiatrist of more than 25 years, agreed. On May 9, 2000, he reported that she had no significant psychiatric disability, and that her psychological state would not interfere with her ability to work. (R. at 201.)

In addition, while Dr. Lekah's medical source statements indicate that Mrs. Van Plew would be prevented from engaging in many types of work, because she could only occasionally lift ten pounds and suffers vertigo, DDS physician Griffin noted that she "is limited to light work activity and should avoid jobs requiring exposure to unprotected heights and hazardous machinery due to dizziness." (R. at 198.) These opinions are not inconsistent.

Moreover, even if Mrs. Van Plew's doctors had expressed an opinion that she was disabled and, therefore, unable to work, such opinions would not be determinative.[6] The final

_____

[6]The Seventh Circuit, in *Garrison v. Heckler*, 765 F.2d 710, 713 (7th Cir. 1985) explains:

> The treating physician's further assertion that [the claimant] is disabled from any employment is not a medical statement at all. It is a proposition about how particular medical impairments produce reductions in physical exertion, and how such reductions in exertion affect the ability to work. The treating physician's views do not answer the question or

43

decision on whether a claimant is disabled is a legal one, not a medical one, and it is the responsibility of the ALJ to make that decision. *Mills v. Sullivan*, 804 F. Supp. 1048, 1057 (N.D. Ill. 1992); 20 C.F.R. §§ 404.1527, 416.927.

Mrs. Van Plew also contends that, in making his RFC determination, the ALJ relied on his conclusions from his first unfavorable decision, thereby, implicitly, ignoring the reports of Dr. Frenkel (R. at 230-31) and Dr. Chu (R. at 326). With regard to Dr. Frenkel's report, this is not so. As explained above, the ALJ expressly addressed that report, and explained why it was not given significant weight.

With regard to Dr. Chu's reports, Mrs. Van Plew specifically points to a summary of an office visit (R. at 326). But, there is nothing in that report that would require the ALJ to find that Mrs. Van Plew had more functional limitations than those included in her RFC. The same can be said for the other medical evidence submitted after the second hearing.[7] (R. at 291-327.)

_____

tell the agency what tasks [the claimant] can and cannot perform.

*See also* 20 CFR 404.1527(e)(2).

[7]This evidence includes MRI reports regarding Mrs. Van Plew's spine and brain; a medical source statement from psychiatrist Gallagher; and opthamaolgical office visit notes from Dr. Chu.

44

In conclusion, an ALJ is not required to provide a written evaluation of every piece of evidence. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Indeed, an ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)). Here, the ALJ stated that he adopted the state agency consultants' findings because they were consistent with the overall records. Accordingly, the Court cannot say that the ALJ's Step Four determination was patently wrong.

## C. The ALJ's Reliance On VE Testimony Did Not Constitute A Due Process Deprivation

Mrs. Van Plew next argues that the ALJ's reliance on the VE's testimony from the first hearing deprived her of her right to due process, because she was entitled to display new evidence to the VE at the second hearing, and to cross-examine the VE at that hearing. At the threshold, the Court notes that Mrs. Van Plew was represented by counsel at all stages of the proceedings, and at no time subsequent to remand did she request an opportunity to cross-examine or submit interrogatories to the VE. Moreover, Mrs. Van Plew incorrectly asserts that the second hearing was *de novo*. To support that assertion, Mrs. Van Plew points to the final

paragraph of the Appeals Council's remand order. (R. at 279-80.) Specifically, Mrs. Van Plew quotes:

> "On remand the Administrative Law Judge will further evaluate the claimant's impairments at step three of the sequential evaluation and will obtain evidence from a medical expert to determine whether the claimant's neurological disorder meets or equals one set forth by the Listings, particularly Sec. 11.19A. The claimant will be given the opportunity to submit updated medical evidence. . . ."

However, Mrs. Van Plew omits the last sentence of that paragraph, which states: "In compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." Clearly, the plain language of the order shows that the second hearing was a limited hearing, merely intended to supplement the first. Accordingly, the hearing was not *de novo*, and it was appropriate for the ALJ to rely upon evidence that was received as part of the initial administrative proceedings. Consequently, it was not error for the ALJ to rely on the VE's uncontradicted testimony that, given Mrs. Van Plew's RFC, she could perform her past work as receptionist.

Mrs. Van Plew's reliance on *Wallace v. Bowen*, 869 F.2d 187 (3d Cir. 1989), to support her assertion to the

contrary, is misplaced.[8]  That case involved a claimant who was not provided with an opportunity to cross-examine Department of Health and Human Services physicians who submitted post-hearing reports adverse to the plaintiff's claim.  *Id.* at 189-90.  The ALJ in *Wallace* relied on those reports in deciding to deny benefits.  *Id.* at 190.

Here, Mrs. Van Plew submitted post-hearing medical reports that, presumably, she considered beneficial to her claim.  Mrs. Van Plew complains that, had she been provided an opportunity to cross-examine the VE on those reports, the VE's testimony may have changed with regard to either the availability of light work, or Mrs. Van Plew's capacity to perform it.  However, the VE testimony that the ALJ relied upon related to his first hypothetical, i.e. what employment would be available to a person with Mrs. Van Plew's RFC. There is no rational basis for concluding that these post-hearing reports would have affected that testimony, because this evidence did not impact the ALJ's RFC finding. Therefore, unlike the situation in *Wallace*, where reliance on the post hearing reports was prejudicial, here, it was not.

_____

[8]The Court notes in passing that, contrary to Mrs. Van Plew's assertion, *Wallace* is not a Seventh Circuit decision.  It is, in fact, from the Third Circuit.

## D. The ALJ's Articulation at Step Three was Adequate

Mrs. Van Plew next argues that the ALJ's decision should be reversed or remanded, because the ALJ failed to undertake his own analysis of her impairments at Step Three, or to minimally articulate why he adopted the ME's conclusions. The Court is not persuaded by this argument. As noted above, an ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d at 371 (citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)). Here, the Appeals Council, pursuant to Judge Brown's order, required the ALJ to "obtain evidence from a medical expert to determine whether the claimant's neurological disorder meets or equals one set forth by the listings, particularly Sec. 11.19A." The ALJ did so, and specifically noted that the ME testified as to Mrs. Van Plew's impairments, concluding that they did not meet or equal the criteria of any impairment listed in Appendix 1, including Listing 11.19A, because bulbar signs were not present. The ALJ explained that his findings were consistent not only with the ME's testimony, but also with the assessments of reviewing state agency physicians and the medical evidence of record. Although not a model of

precision, this explanation sufficiently establishes the ALJ's reasoning.

Mrs. Van Plew also argues that the record evidence may support meeting Listing 11.19(B) as to her gait and station, specifically pointing to Dr. Lekah's December 14, 1998 report, which states that she had some difficulty with her gait. However, the Record also contains subsequent reports from Dr. Lekah, which tend to support the ALJ's RFC determination. On March 11, 1999, he observed that Mrs. Van Plew's "gait is normal;" on July 20, 1999, Dr. Lekah stated that "she has no motor deficits or any significant gait difficulty;" and, on January 24, 2000, he stated that "[h]er gait is normal. She can tandem walk." (R. at 202.) Moreover, the record also shows that the ME explained that Mrs. Van Plew, by her own testimony, did not have the "significant and persistent disorganization of motor function of two extremities resulting in sustained disturbance of gross and dexterous movements or gait or station," as is required by Listing 11.19(B). Accordingly, the Court rejects Mrs. Van Plew's claim that there is not substantial evidence of record to support the ALJ's conclusion that she did not meet that listing.

Finally, Mrs. Van Plew objects to the ALJ's finding that her impairments were not equivalent to any listing.

49

She contends that the ALJ "completely abrogated his responsibility under 404.1527(f)(2) to undertake an analysis as to whether the claimant's condition 'equals' a listed impairment." (Plaintiff's brief at 26.) However, as with his determination that Mrs. Van Plew did not meet a listing, the ALJ explained that his findings were consistent with the ME's testimony, as well as with the assessments of reviewing state agency physicians and the medical evidence of record. (R. at 258-59.) Although the Court considers the ALJ's explanation to be laconic, an ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned. *Guercio v. Shalala*, 1994 WL 66102 at *9 (N.D. Ill. 1994). The ALJ has done so here. Accordingly, the Court finds that the ALJ's explanation is consistent with 20 CFR 404.1526), which provides that the Agency, in determining equivalence, will consider all record evidence concerning a claimant's case, as well as the opinions given by one or more medical or psychological consultants designated by the Commissioner.

## Conclusion

For the reasons set forth above, the Court finds that the Commissioner's finding that Plaintiff was not disabled

is supported by substantial evidence on the record as a whole. Accordingly,

IT IS HEREBY ORDERED that the Commissioner's Motion for Summary Judgment be, and the same hereby is, granted.

IT IS FURTHER ORDERED that Plaintiff's Motions for Summary Judgment or Remand be, and the same hereby are, denied.

Dated: AUGUST 3, 2006    E N T E R E D:

ARLANDER KEYS
United States Magistrate Judge